**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4499-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JEREMIAH E. MONELL,

     Defendant-Appellant.

_____

Argued November 1, 2021 – Decided November 15, 2021

Before Judges Fasciale and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-03-0270.

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alyssa Aiello, of counsel and on the brief).

Valeria Dominguez, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Valeria Dominguez, of counsel and on the brief).

PER CURIAM

Defendant stabbed his wife eighty-nine times in their mobile home in front of their twelve-year-old son (the son), who testified during the trial. The son heard his mother's body hit the ground and watched his father choke her while she screamed. He saw his father grab a knife in the kitchen and begin stabbing her; as this was happening, the son heard his mother's blood gushing from her body. The son got under his blanket, cried, then peaked into the room where his parents were and saw his father smoking a cigarette.

The son immediately accused his father of killing his mother and then cried himself to sleep after defendant said he should not have seen it. The next morning, the son and his five-year-old sister, also in the mobile home, found their mother's body under a blanket. The son carried his sister to a neighbor's home and explained what he saw. The knife left long jagged incised wounds in the victim's neck that cut through her trachea and esophagus, and she also suffered blunt force injuries to her right shoulder, arm, and thigh. The cause of death was "multiple sharp force injuries."

Defendant appeals from his convictions for first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1)-(2) and N.J.S.A. 2C:11-3(b)(4)(c); third-degree possession of a weapon (knife) for an unlawful purpose, N.J.S.A.

2

2C:39-4(d); and fourth-degree unlawful possession of a weapon (knife), N.J.S.A. 2C:39-5(d). The judge imposed an aggregate sentence of life in prison without parole.

On appeal, defendant raises the following arguments:

POINT I

THE JURY VOIR DIRE WAS FATALLY FLAWED BY THE INTENSE DISCORD EXHIBITED BETWEEN [DEFENDANT] AND HIS ATTORNEYS IN FRONT OF THE JURY VENIRE, RESULTING IN A HIGH PROBABILITY OF PREJUDICE THAT ONLY A MISTRIAL WITH A NEW JURY SELECTION PROCESS COULD HAVE CURED.

    A. The Conflict Between [Defendant] And His Attorneys.

    B. The Right To Peremptorily Remove A Prospective Juror Is A Substantial Right, And The Decision To Exercise That Right Is Primarily The Defendant's.

    C. The Court Erred In Denying [Defendant's] Motion For A Mistrial.

POINT II

THE TRIAL [JUDGE'S] DENIAL OF [] DEFENDANT'S MOTION TO PROCEED PRO SE WAS ERRONEOUS AND NECESSITATES REVERSAL.

3

POINT III

THE ADMISSION OF DETECTIVE CRAIN'S EXPERT TESTIMONY VIOLATED [DEFENDANT'S] RIGHT TO DUE PROCESS AND A FAIR TRIAL, BECAUSE (1) THE SCIENTIFIC RELIABILITY OF THE METHODOLOGY UPON WHICH HIS OPINION WAS BASED WAS NOT ESTABLISHED AT A FRYE HEARING; (2) CRAIN DID NOT FOLLOW ESTABLISHED QUALITY CONTROL PROTOCOLS FOR FRICTION RIDGE ANALYSIS; AND (3) CRAIN'S CONCLUSIONS WERE NOT QUALIFIED OR LIMITED IN ACCORDANCE WITH ESTABLISHED STANDARDS.

A. The Trial Court Erred In Failing To Hold A Frye Hearing Because The State Failed To Sufficiently Counter [Defendant's] Challenge To Scientific Reliability Of The ACE-V Method.

B. Crain's Failure To Follow SWGFAST[1] Standards Regarding Documentation And Verification Rendered His Expert Testimony Inadmissible.

C. Crain's Testimony Improperly Implied That His Conclusions Were Far More Certain Than Current Standards Of Scientific Accuracy Allow.

---

[1] Scientific Working Group for FRS analysis and identification (SWGFAST) is a national group that sets standards and guidelines for FRS analysis and identification.

A-4499-18

POINT IV

[DEFENDANT'S] SENTENCE OF LIFE WITHOUT PAROLE CANNOT STAND FOR THREE REASONS: THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THE WANTONLY VILE AGGRAVATING FACTOR; THE TRIAL [JUDGE] FAILED TO PROVIDE THE JURY WITH ANY INSTRUCTIONS ON THE AGGRAVATING FACTOR; AND THE TRIAL [JUDGE] FAILED TO HOLD A SEPARATE PENALTY PHASE. (Not Raised Below).

    A.    The Wantonly Vile Aggravating Factor.

    B.    The Wantonly Vile Aggravating Factor Should Not Have Been Submitted To The Jury, Because The Evidence Did Not Establish That [Defendant] Acted With A Depraved Mind Or With The Conscious Object To Cause Extreme Pain Or Suffering In Addition To Death.

    C.    The Trial Court Failed To Provide The Jury With Any Instruction On The Wantonly Vile Aggravating Factor.

    D.    The Judge Erred In Failing To Hold A Separate Penalty Proceeding.

We entirely disagree with defendant's arguments and affirm.

I.

We begin by rejecting defendant's arguments in Points I and II, that after he had a conflict with his counsel over their exercise of peremptory challenges,

5

the judge erred by denying defendant's motions for a mistrial and to proceed pro se.

On the second day of jury selection, the parties had empaneled fourteen jurors after the judge excused several jurors for cause. At that time, the judge permitted the parties to exercise peremptory challenges. The State was satisfied with the jury as it was constituted. Defense counsel struck Juror No. 1 because she had previously obtained a domestic violence restraining order against her husband, who was a police officer. Defendant immediately objected, complaining his attorneys had not discussed excusing Juror No. 1 with him. After the judge replaced Juror No. 1, defendant complained directly to the judge, who instructed defendant not to speak directly to him. The judge told defendant to speak to his attorneys, who would advocate for him. Defendant ignored the judge and stated he had a "problem with who they just excused" and that his attorneys were "taking this into their own hands." Defendant said, "No, you can send me back out, because . . . you're . . . tak[ing] away my decision making that [Juror No. 1] was a fair and just person" who he believed should have been kept on the jury.

The judge held a sidebar conference and excused all the potential jurors from the courtroom. He gave defendant time to speak with counsel about jury

6

selection. Defense counsel told the judge that jurors had heard defendant say, "Just go ahead and send me back." But the judge disagreed and added that he, himself, had not heard it, and that he was "in the best position to hear it" because he was "much closer to [defendant] than the jury." The court clerk also noted that there was white noise playing when defendant spoke out. The assistant prosecutor stated that he had heard defendant say, "send me down," and not "send me back." The judge agreed with the assistant prosecutor that he had heard "send me down."

Defendant complained that Juror No. 1 was going to make a "fair and just decision" and that his attorneys were not considering his input on jury selection. The judge instructed defense counsel to "work out" the issue with defendant. When the parties went back on the record, defense counsel raised a concern that, after they had explained their strategy for excusing the juror, defendant "repeated" that strategy while the jurors were in the courtroom. The judge cautioned defendant against speaking out when the jury was in the courtroom, but defendant replied that he was "not worried."

After the break, at defense counsel's request, the judge questioned one juror who was seated closest to the judge to see if that juror had heard what defendant had said. The juror stated that what was overheard would not affect

7 A-4499-18

the juror's ability to be fair and impartial. Counsel declined the opportunity to ask the juror any other questions, and the judge instructed the juror to return to the jury box.

The State remained satisfied with the jury, and defense counsel exercised a second peremptory challenge. Defendant immediately objected. The judge brought all parties to sidebar, telling them that he could not have defendant making outbursts in open court. After the voir dire of another potential juror, the jurors were excused for lunch. Defendant continued complaining about the representation of his attorneys and stated, "why don't I just represent myself . . . if they're against me."

After the lunch break, defense counsel agreed that they would "proceed as [defendant] feels fit," but that they could not talk to defendant because he was "laying on the floor," refusing to speak to them. Defendant was eventually brought into the courtroom, and all agreed that if defendant did not want to challenge a juror, defense counsel would not exercise the challenge. Defendant reiterated his wish to represent himself, and the judge told him that he would not "mak[e] that decision today" and was "not changing counsel in the middle of a jury selection." The jury was brought back into the courtroom, and

defendant stated his satisfaction with the jury, at which point they took their oath.

Defendant filed his motions to proceed pro se and "excuse the jury," which the judge addressed on the next trial day. Correctly noting that jeopardy had attached when the jury was sworn, the judge treated defendant's request to "excuse the jury" as a motion for mistrial and denied the motion.

## A.

The judge's decision denying defendant's motion for a mistrial is entitled to deference by this court and should be affirmed "absent an abuse of discretion that results in a manifest injustice." State v. Jackson, 211 N.J. 394, 407 (2012) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). We conclude there was no manifest injustice, and defendant did not have the absolute right to control his attorneys' strategic choices during jury selection.

"Trial management is the lawyer's province[.]" McCoy v. Louisiana, 138 S. Ct. 1500, 1508 (2018). "Giving the attorney control of trial management matters is a practical necessity" as "[t]he adversary process could not function effectively if every tactical decision required client approval." Gonzales v. United States, 553 U.S. 242, 249 (2008) (quoting Taylor v. Illinois, 484 U.S. 400, 418 (1988)). Defense counsel, therefore, has the "authority to make the

9

necessary decisions as to the management of the case." State v. Pratts, 145 N.J. Super. 79, 88 (App. Div. 1975); see id. at 88-91 (holding that defense counsel may refuse to call witnesses counsel deems harmful, despite defendant's objection); see also State v. Bentley, 46 N.J. Super. 193, 201-02 (App. Div. 1957) (finding that trial counsel has "implied authority to make all necessary decisions on all matters incidental to the management of the case which affect only procedure or remedy as distinguished from the cause of action itself, and the party is bound by such acts").

The selection of a jury is one such tactical and strategic case management decision. State v. Hightower, 120 N.J. 378, 402-03 (1990). In arguing that defendant, not his counsel, should have been the ultimate decision-maker for selecting a jury, defendant relies on his right to be present at jury selection, and specifically, at voir dire sidebars. See State v. Dishon, 297 N.J. Super. 254, 268 (App. Div. 1997); see also R. 3:16(b) (stating that "defendant shall be present at every stage of the trial, including the impaneling of the jury"). However, a defendant's right to be present at voir dire sidebars is "not absolute," as the defendant must "affirmatively request" to participate, and participation is permitted only "as far as security will allow." State v. W.A., 184 N.J. 45, 48, 60, 63 (2005).

W.A. recognized that jury challenges for cause, which "involve[] proof of legally cognizable grounds," are "fairly characterized as within the attorney's field of expertise." Id. at 54. In contrast, defendants may play a "critical role" in the exercise of peremptory challenges, which rely on "the vagueness of an impression or intuitive feeling." Ibid. However, this "critical role" has not been extended to provide defendant the right to veto defense counsel's recommendations regarding specific jurors. Rather, both the United States Supreme Court and this court have expressed a clear preference to leave the ultimate responsibility of trial management in the hands of competent defense counsel. See Gonzales, 553 U.S. at 249; Pratts, 145 N.J. Super. at 88-90.

Even if defendant should have been permitted a veto of his counsels' peremptory challenges—which is not the case—the judge's denial of defendant's motion for a mistrial was at best harmless error and not "clearly capable of producing an unjust result." W.A., 184 N.J. at 66 (applying harmless error analysis to the trial judge's refusal to allow the defendant to be present at voir dire sidebar); see also R. 2:10-2 (stating that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result"). Defense counsel's decision to exclude a juror who had been involved in her own domestic violence matter, and

whose husband was a police officer, can hardly be considered prejudicial to defendant and could not have led to an unjust verdict.

We see no error in the trial judge's denial of a mistrial due to defendant's outbursts in front of the jury. A defendant who engages in misconduct in the presence of a jury is not entitled to a mistrial. See State v. Montgomery, 427 N.J. Super. 403, 407-09 (App. Div. 2012). A defendant may not engage in courtroom misconduct "and then expect to be rewarded with a mistrial or new trial" when the trial judge has taken "appropriate cautionary measures," as the judge did here. Id. at 404.

## B.

On his motion to proceed pro se, the judge took testimony from defendant regarding his education level (third grade), his profession (carpenter), whether he had ever participated in or observed a criminal trial (he had not), and why he wanted to proceed pro se (to cross-examine the witnesses against him). It was clear defendant was unprepared to represent himself.

Defendant understood that he was charged with murder but did not know the elements of that crime or any potential defenses, nor the State's burden of proof. The judge warned defendant that he needed to understand the risk he was taking "[b]ecause, if you represent yourself, you have to follow the same rules

12

[counsel] would have to follow," including how to admit evidence. Defendant replied that he understood. The judge also warned defendant that he would be giving up his right to argue later that counsel was ineffective. Defendant told the judge that he was "not so concerned about the risks" because he did not have "anything . . . to lose" and still wanted to represent himself. The judge told defendant that there would be no delay in the case, as the jury had been sworn and opening arguments were scheduled for the next day, and asked how defendant would be prepared to proceed then. Defendant stated that, although he was prepared "mentally" and "physically," he was "not prepared in a way of the paperwork and the [m]otions."

The judge denied defendant's motion to proceed pro se, finding that defendant had not made the motion in a timely manner. As the judge found, defendant's unfamiliarity with the Rules of Evidence and any potential defenses would require a delay in the case, as defendant "could not effectively prepare to represent himself in this case within the time limits" as the jury had already been empaneled. The judge "question[ed] strongly" whether defendant understood the risks of representing himself, noting that defendant's responses were not indicative of someone who wanted to take such risks; rather, defendant wanted to have "competent representation" and "simply want[ed] to be heard."

However, the "primary reason" the judge denied defendant's motion was "the delay." The judge ruled he would not "jeopardize this trial or jeopardize the ability of this jury to participate by an undue delay that would be created by the switching out of counsel to a self-represented individual."

We see no error in the judge's denial of defendant's motion to proceed pro se. The denial of a pro se motion is reviewed for "abuse of discretion." State v. Outland, 245 N.J. 494, 507 (2021) (citing State v. DuBois, 189 N.J. 454, 475 (2007)). A defendant's right of self-representation is "fundamental," but "not absolute," and "cannot be used to jeopardize the State's equally strong interest in ensuring the fairness of judicial proceedings and the integrity of trial verdicts." State v. King, 210 N.J. 2, 18 (2012) (citing State v. Reddish, 181 N.J. 553, 579 (2004) and State v. McNeil, 405 N.J. Super. 39, 51 (App. Div. 2009)). A defendant's decision to represent himself must be both "knowing, voluntary, and intelligent" and made in a "timely fashion." State v. Rose, 458 N.J. Super. 610, 626-27 (App. Div. 2019); see also Martinez v. Ct. of Appeal of Cal., 528 U.S. 152, 161-62 (2000) (explaining that a "defendant must voluntarily and intelligently elect to conduct his own defense, and most courts require him to do so in a timely manner") (internal citations and quotation marks omitted).

A trial judge's review of a defendant's motion to proceed pro se is a "two-step process." Rose, 458 N.J. Super. at 626. First, the motion must be timely, "so as not to 'disrupt the criminal calendar, or a trial in progress.'" Ibid. (quoting State v. Buhl, 269 N.J. Super. 344, 362 (App. Div. 1994)). Second, the trial court must determine whether defendant's waiver of his right to counsel "is indeed knowing, voluntary, and intelligent after a searching inquiry that involves advising the defendant of the risks and pitfalls of self-representation." Id. at 627 (citing DuBois, 189 N.J. at 468-69). When the trial judge "analyzes a defendant's responses" to this inquiry, he or she "should indulge [in] every reasonable presumption against waiver." King, 210 N.J. at 19 (alteration in original) (quoting State v. Gallagher, 274 N.J. Super 285, 295 (App. Div. 1994)).

This "searching inquiry" requires the trial judge to inform defendant "of the nature of the charges against [him], the statutory defenses to those charges, and the possible range of punishment." State v. Crisafi, 128 N.J. 499, 511 (1992). The goal of this inquiry "is not to ascertain whether a defendant possesses technical legal knowledge," but rather to "apprise the defendant 'of the dangers and disadvantages of self-representation.'" Outland, 245 N.J. at 506 (citing Faretta v. California, 422 U.S. 806, 835 (1975)). The judge should "specifically advise the defendants that it would be unwise not to accept the

assistance of counsel." <u>Crisafi</u>, 128 N.J. at 512. Further, the judge should "inform defendants of the technical problems they may encounter in acting as their own counsel and of the risks they take if their defense is unsuccessful," explain that defendant must still "conduct their defense in accordance with the relevant rules of criminal procedure and evidence," and that defendant's lack of knowledge may "impair" his ability to defend himself. <u>Id.</u> at 511-12. The judge should engage in a "penetrating examination of the knowingness and intelligence of a defendant's attempted waiver of the assistance of counsel," including

> whether defendant will experience difficulty in separating his roles as defendant and counsel; whether defendant understands that he not only has the right not to testify, but also the right not to incriminate himself in any manner; whether he understands that he could make comments as counsel from which the jury might infer that he had knowledge of incriminating evidence (and the difficulty in avoiding such comments); and whether he fully understands that if he crosses the line separating counsel from witness, he may forfeit his right to remain silent and subject himself to cross-examination by the State.
>
> [<u>Reddish</u>, 181 N.J. at 594.]

Finally, the judge must advise defendant that if he represents himself, he will "waive any and all later claims that his self-representation constituted ineffective assistance of counsel." <u>Ibid.</u> (citing <u>Faretta</u>, 422 U.S. at 835 n.46).

16

The timeliness of a defendant's request to represent himself is a matter for the sound discretion of the trial judge. Buhl, 269 N.J. Super. at 363-64. "A defendant cannot be permitted to place the trial judge in the unenviable dilemma where, in managing the business of the court, he appears to be depriving the accused of his right to self-representation." Id. at 363. Thus, a "defendant desiring to exercise the right" to represent himself "must do so with reasonable diligence." Ibid.

In Buhl, this court rejected as "too broad[]" a proposed rule that "a request to proceed pro se made before a jury is sworn should ordinarily be honored." Ibid. Thus, Buhl's request made "immediately before the jury was empaneled" was untimely. Id. at 364; see also State v. Pessolano, 343 N.J. Super. 464, 473 (App. Div. 2001) (finding that the defendant's pro se request made after jury selection was untimely). In contrast, pro se requests made "well in advance of trial," Rose, 458 N.J. Super. at 628, and "about six weeks prior to trial," State v. Thomas, 362 N.J. Super. 229, 240 (App. Div. 2003), were timely.

We conclude that the judge did not abuse his discretion by holding that defendant's pro se request here was untimely. Defendant's pro se request was made more than a full day after jury selection began. Permitting defendant to proceed pro se would have necessarily engendered an unacceptable delay in the

17

trial proceedings, especially given defendant's limited education and admitted unfamiliarity with the law and the Rules of Evidence.

We reject defendant's assertion that the judge erred by not engaging in the full inquiry required by Crisafi and Reddish, notwithstanding the judge's determination that defendant's motion was untimely. The judge informed defendant of the risks of self-representation, that he would be expected to follow the legal procedures and evidence rules in examining witnesses and seeking to admit evidence, and that he could not later claim ineffective assistance of counsel if he chose to represent himself. The judge further warned defendant that, by representing himself, he could ask questions that could lead to claims that defendant had waived his right to remain silent and might subject him to cross-examination. The judge's inquiry thus "apprise[d] the defendant 'of the dangers and disadvantages of self-representation.'" Outland, 245 N.J. at 506 (quoting Faretta, 422 U.S. at 835).

Although the judge did not discuss the "statutory defenses to" the charges against defendant, or "the possible range of punishment," as required by Crisafi, 128 N.J. at 511, we see no error by denying his motion. The "searching inquiry" required by Crisafi and Reddish is the second step of a two-step process, as this court noted in Rose, 458 N.J. Super. at 627. Once the judge determined that

defendant had not satisfied the first step, the judge had no obligation to continue his inquiry to satisfy the requirements of the second step fully. See Pessolano, 343 N.J. Super. at 473 (ruling the trial judge did not abuse his discretion in denying the defendant's pro se request without mention of Crisafi requirements because the request was untimely).

## II.

Defendant argues in his Point III that the judge erred (1) by not holding a Frye[2] hearing on the admissibility of expert testimony regarding the identification of defendant's bloody palm print on the larger of the two knives found behind the victim's stove, and (2) by admitting such expert testimony despite defendant's challenges to the methodology used by Detective Eric Crain, the State's fingerprint expert.

N.J.R.E. 702 allows an expert who is qualified by knowledge, skill, experience, training, or education to testify in the form of an opinion if scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence. The "well-known prerequisites" to this rule are: "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such

---

[2] Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923).

A-4499-18

that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." Hisenaj v. Kuehner, 194 N.J. 6, 15 (2008); see also State v. Torres, 183 N.J. 554, 567-68 (2005).

"If a party challenges an expert opinion pursuant to N.J.R.E. 702, the 'trial [judge] should conduct a hearing [under N.J.R.E. 104] concerning the admissibility of the proposed expert testimony.'" State v. J.R., 227 N.J. 393, 409 (2017) (second alteration in original) (quoting Torres, 183 N.J. at 567). At such hearing, the proponent of the expert "may demonstrate that the expert's methodology meets the benchmark of N.J.R.E. 702, and the opposing party may challenge the reliability of the expert's opinion." Id. at 410. The trial judge's evidentiary ruling that a witness is qualified to present expert testimony under N.J.R.E. 702 is reviewed for abuse of discretion and should be reversed only "for manifest error and injustice." State v. Rosales, 202 N.J. 549, 562-63 (2010) (quoting State v. Jenewicz, 193 N.J. 440, 455 (2008)).

In criminal cases, for challenges relating to the reliability of the field for which expert testimony is sought, our Supreme Court "continue[s] to rely on the Frye standard to assess reliability." State v. J.L.G., 234 N.J. 265, 280 (2018) (citing Frye, 293 F. at 1014). Under this standard, the trial judge must "determine whether the science underlying the proposed expert testimony has

'gained general acceptance in the particular field in which it belongs.'" Ibid. (quoting Frye, 293 F. at 1014). "[T]here are three ways to establish general acceptance under Frye: expert testimony, authoritative scientific and legal writings, and judicial opinions." Id. at 281. To establish general acceptance, "the party proffering the evidence need not show infallibility of the technique nor unanimity of its acceptance in the scientific community." State v. Cassidy, 235 N.J. 482, 492 (2018). Rather, "[t]he State's burden is to prove that the . . . test and the interpretation of its results are non-experimental, demonstrable techniques that the relevant scientific community widely, but perhaps not unanimously, accepts as reliable." State v. Ghigliotty, 463 N.J. Super. 355, 383 (App. Div. 2020) (omission in original) (quoting Harvey, 151 N.J. at 171).

Defendant moved to preclude Crain's expert testimony, arguing that the State had not provided an expert report as required by Rule 3:13-3 and that "[l]atent print evidence" was "scientifically invalid," relying on a 2016 report from the President's Council of Advisors on Science and Technology (PCAST), which cited two studies, one by the FBI and one by the Miami-Dade Police, that found false positive rates for latent fingerprint matches of 1 in 306, and 1 in 18, respectively. The judge held an N.J.R.E. 104 hearing at which Crain testified, and defendant called no witnesses.

A-4499-18

At the hearing, Crain testified as to his experience with fingerprint and "friction ridge skin" (FRS) analysis.[3]  Crain's experience included eleven years with the New Jersey State Police Crime Scene Investigation South Unit, and specific training in FRS detail analysis with both the State Police and the Palm Print Identification School at the Henry C. Lee Institute in Connecticut.  Crain testified that he was an instructor with the New Jersey State Police Crime Scene Investigation School, where he taught FRS latent print identification and was an adjunct professor at Rowan College, teaching courses on forensic science.  Crain had been qualified as an expert in friction ridge skin identification and analysis in two previous Superior Court criminal proceedings and had been involved in hundreds of cases involving FRS detail identification and analysis.

Crain testified that the New Jersey State Police use the "ACE-V" methodology for evaluating a fingerprint match.[4]  According to Crain, ACE-V is the "standard for identifying, analyzing and processing a latent print" used by the New Jersey State Police and elsewhere, including the Lee Institute.  ACE-V

---

[3]  FRS is the skin on a person's fingerprints, palms, and soles of the feet that "applies grip and traction" and is unique to each person.

[4]  ACE-V is an acronym referring to the four phases of the methodology: analysis, comparison, evaluation, and verification.

     A-4499-18

had been used for all of Crain's eleven years of experience in crime scene investigation and is used by SWGFAST.

Crain testified that a palm print in blood had been found on the larger of the two knives discovered in the victim's kitchen. He explained that the palm print was not "latent" but was "patent"; that is; a print that occurs FRS contacts a "foreign substance, such as grease, oil, [or] blood" before touching another surface. Using the ACE-V method, he used a chemical to enhance the patent print, photographed the print and submitted the photographs to the automated fingerprint identification system (AFIS) computer database to search for a match. AFIS returned a "hit" that the palm print belonged to defendant. Crain then did his own comparison and evaluation of the bloody print and defendant's palm. In reviewing the comparison points of identification between the bloody print and defendant's palm, Crain stopped counting at twenty-five. Thus, Crain determined that it was, in fact, defendant's print, which was verified by another detective also trained in fingerprint analysis. On cross-examination, Crain testified that he was "aware" of the PCAST report but was unaware of its contents.

The judge denied defendant's motion to exclude Crain's testimony. The judge found Crain's testimony to be credible and determined that the State had

demonstrated that he was qualified as an expert in the field of fingerprint analysis, which was "beyond the ken of a normal juror." The judge further found that the ACE-V methodology is a "generally accepted standard for [FRS] analysis, whether it be fingerprint analysis or palm print analysis," and that the procedures used by Crain, in this case, were "reasonable" and not "flawed or overly suggestive." Thus, the judge permitted Crain to testify at trial that it was defendant's palm print on the knife, but only "within a reasonable degree of probability," not as "a 100 percent match." Any challenges to Crain's methodology could have been brought up by the defense on cross-examination.

Crain testified as an expert at trial, in accordance with the court's ruling, that "within a reasonable degree of probability" it was defendant's palm print on the knife. Defense counsel cross-examined Crain regarding his findings. He asked Crain about the PCAST report and the two studies cited therein regarding the error rate for latent fingerprint analysis. Crain testified only that he recalled defense counsel discussing those studies but was unable to form an opinion because he had no personal knowledge.

We see no abuse of discretion by the judge in admitting Crain's expert testimony. The judge appropriately held an N.J.R.E. 104 hearing on defendant's motion to exclude Crain's testimony. Although defendant complains that this

did not rise to the level of a <u>Frye</u> hearing, the judge complied with the requirements of <u>Frye</u>, and determined, based on Crain's credible expert testimony, that the ACE-V methodology was the "generally accepted standard for [FRS] analysis."

Nor has defendant raised any persuasive arguments to challenge that determination. Evidence relating to fingerprint analysis has been accepted by the New Jersey courts for over 100 years. <u>See</u> <u>State v. Cerciello</u>, 86 N.J.L. 309 (E. & A. 1914) (approving admissibility of fingerprint evidence). Although no reported New Jersey cases have specifically addressed the reliability of the ACE-V methodology, "[n]umerous [federal] courts have found expert testimony on fingerprint identification based on the ACE-V method to be sufficiently reliable." <u>United States v. Pena</u>, 586 F.3d 105, 110-11 (1st Cir. 2009) (citing cases); <u>see also</u> <u>United States v. Straker</u>, 800 F.3d 570, 630-32 (D.C. Cir. 2015); <u>United States v. Herrera</u>, 704 F.3d 480, 484 (7th Cir. 2013). Further, defendant has not pointed to any cases holding that the ACE-V method is unreliable. Thus, "'it is difficult to discern,' without more, 'any abuse of discretion when the [trial judge] decides to admit expert testimony that relies on the ACE-V method.'" <u>Straker</u>, 800 F.3d at 631-32 (quoting <u>Pena</u>, 586 F.3d at 110-11).

Defendant asserts that because he raised the issues relating to the error rate in latent fingerprint identification as set forth in the PCAST report, the "State was required to do more" than merely present Crain's testimony to demonstrate the reliability of the ACE-V methodology. However, in light of the clear, general acceptance of the ACE-V methodology throughout the United States and testimony of the State's expert to that effect, we disagree. In the absence of any testimony by a witness who had actual knowledge of the PCAST report, or the studies referred to therein, the judge had no basis to rule that the ACE-V method was unreliable. Moreover, defendant himself characterizes the PCAST report as relating to "latent" fingerprint analysis. As Crain testified, the palm print at issue was not "latent" but was "patent." Thus, the judge did not abuse his discretion in determining that the ACE-V method was scientifically reliable.

Finally, Crain's testimony regarding the palm print match was properly admitted under N.J.R.E. 702. Defendant asserts that Crain did not comply with the SWGFAST guidelines in determining that the palm print matched defendant's, within a reasonable degree of probability, and that Crain overstated the strength of his conclusion. However, defendant's arguments rely solely on SWGFAST documents that were not raised and are therefore outside the record

26

on appeal. See Scott v. Salerno, 297 N.J. Super. 437, 447 (App. Div. 1997) (limiting appellate review "to the record made in the trial court, and appellate courts will not consider evidence submitted on appeal that was not in the record before the trial court") (internal citations omitted); R. 2:5-4. Moreover, Crain explained in detail his methodology and his conclusions, and defendant had ample opportunity to cross-examine him on these issues. See State v. Clowney, 299 N.J. Super. 1, 19 (App. Div. 1997) (explaining that "expert testimony and opinion are subjects for legitimately expansive cross-examination" to enable the jury to "assess their soundness"); State v. Frost, 242 N.J. Super. 601, 615 (App. Div. 1990) (noting that "[t]he credibility of the expert, and the weight to be accorded his or her testimony, is assessed by the trier of fact; any testimonial or experience weaknesses in the testimony may be exposed by cross-examination"). Thus, the judge did not abuse his discretion in admitting Crain's expert testimony.

## III.

In Point IV, defendant asserts that the judge erred in imposing a mandatory sentence of life without parole (LWOP) under N.J.S.A. 2C:11-3(b)(4). He argues for the first time that the jury was not adequately instructed on aggravating factor (c).

At the charge conference, counsel agreed not only about the jury instructions but also the interrogatories contained on the verdict sheet. Despite direct questions about the aggravating factor by the judge, defense counsel did not request any additional language. Instead, defendant requested a charge for passion/provocation manslaughter, which the judge included in his final jury charge.

The judge then charged the jury. After he finished, defense counsel had no objection. The judge reviewed the jury sheet with the jury, again without objection. By answering the questions on the sheet, the jury found defendant guilty of purposely or knowingly causing the death of the victim; that he did so by his own conduct; and that the act of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, of an aggravated assault of the victim.

At sentencing, defense counsel acknowledged that given the jury's finding as to the aggravating factor, the judge did not have much discretion about what sentence to impose. The State emphasized that the statute mandated a sentence of life in prison without parole. The judge found aggravating factors three (risk of re-offense), nine (deterrence), fourteen (offense involved domestic violence in front of a child), and fifteen (history of domestic violence). The judge found

no mitigating factors, including not finding requested mitigating factor seven, because defendant had been previously arrested six times.

Because defendant never objected to any portion of the jury charge, we review his contention for plain error. State v. Munafo, 222 N.J. 480, 488 (2015); see also R. 1:7-2 (stating that "no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict"). Plain error in the context of a jury charge "requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Singleton, 211 N.J. 157, 182-83 (2012) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). "[T]he prejudicial effect of an omitted instruction must be evaluated 'in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel.'" State v. Marshall, 123 N.J. 1, 145 (1991) (second alteration in original) (quoting Kentucky v. Whorton, 441 U.S. 786, 789 (1979)).

In 2007, the New Jersey State Legislature repealed the death penalty and replaced it "with life imprisonment without eligibility for parole in certain

circumstances." State v. Troxell, 434 N.J. Super. 502, 510 (App. Div. 2014) (citing S. Comm. Statement to S. Comm. Substitute for S. Nos. 171 & 2741 (May 10, 2007), enacted as L. 2007, c. 204 (Dec. 17, 2007)). Under this revised statutory scheme, a defendant convicted of murder is subject to a mandatory LWOP sentence "if the State proves one of several 'triggering factors,'" including, as relevant here, that defendant "committed the homicidal act by his own conduct," and "if a jury finds beyond a reasonable doubt that any" of certain enumerated "aggravating factors exist." Ibid. (quoting N.J.S.A. 2C:11-3(b)(4)). These aggravating factors are nearly identical to those used for the now-repealed death penalty. See John M. Cannel, N.J. Criminal Code Annotated, cmt. 7b on N.J.S.A. 2C:11-3 (2021). One of those enumerated aggravating factors is a finding by the jury that "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of the mind, or an aggravated assaulted to the victim." N.J.S.A. 2C:11-3(b)(4)(c).

In the death penalty context, our Supreme Court required that jurors considering this aggravating factor be instructed that "'[t]orture or aggravated [assault] to the victim shall be found if the defendant intended to cause, and did in fact cause, severe physical or psychological pain or suffering to the victim prior to the victim's death,' and that depravity shall be found if the murder

'served no purpose for the defendant beyond his pleasure of killing.'" State v. Bey, 112 N.J. 123, 173 (1988) (Bey II) (quoting State v. Ramseur, 106 N.J. 123, 211 (1987)).

The evidence presented at trial, including the fact that the victim, with her young children nearby, suffered eighty-nine separate stab wounds and begged defendant to let her die in peace, supported the submission of that aggravating factor to the jury. See State v. Morton, 155 N.J. 383, 463 (1998) (no error in submission of "wantonly vile" aggravating factor to jury when victim was stabbed twenty-four times and other evidence supported "the conclusion that defendant 'inflict[ed] pain incremental to that attributable to the act of killing'") (alteration in original) (quoting State v. Erazo, 126 N.J. 112, 138 (1991)). Nor was a separate penalty phase required to determine the applicability of that aggravating factor. See Troxell, 434 N.J. Super. at 512 n.4 (finding a separate penalty proceeding unnecessary if the jury has already found the aggravating factor beyond a reasonable doubt). But the judge did not explicitly instruct the jurors that aggravating factor (c) required a finding beyond a reasonable doubt that defendant intended to cause pain and suffering beyond the act of killing, as required by N.J.S.A. 2C:11-3(b)(4), Ramseur, and Bey (II).

While this was an error, this does not amount to plain error for two reasons: (1) the judge repeatedly advised the jury that the State's burden on each and every element of the offense was beyond a reasonable doubt; and (2) given the overwhelming evidence in this case and gruesome nature of the crime, the failure to include the additional language did not lead the jury to reach a result it otherwise would not have reached.

During trial, the judge correctly instructed the jurors that the State had the burden of proving every element of the offenses charged beyond a reasonable doubt, and correctly instructed the jury on the elements of murder under N.J.S.A. 2C:11-3.  The court further instructed the jurors, using the Model Jury Charges (Criminal), "Murder-Own Conduct-Life Without Possibility of Parole, (N.J.S.A. 2C:11-3(b)(4))" (approved May 11, 2015), that they must decide whether the State had proven beyond a reasonable doubt that defendant had committed the murder by his own conduct.  The court then instructed the jurors on the elements of the weapons offenses with which defendant was charged, before finally reviewing the verdict sheet with the jury.  With respect to aggravating factor (c), the judge simply instructed the jurors that, if they answered Question 1 (murder) and Question 2A (murder-own conduct) in the affirmative, they should

> proceed to Question 2B.  Question 2B is as follows.  Do you find that [d]efendant . . . on or about the 18th day

A-4499-18

of December 2016 in the Township of Commercial in the County of Cumberland aforesaid and within the jurisdiction of this [c]ourt committed the act of murder and that said act was outrageously or wantonly vile, horrible or inhumane and that it involved torture, depravity of mind or an aggravated assault on the victim . . . ? And the answer to that is either no or yes.

The judge, while not explicitly, advised the jury that the State had the burden, even on this aggravating factor, of proving each and every element against defendant beyond a reasonable doubt. Thus, in light of the totality of the circumstances, the error did not create "a clear capacity to bring about an unjust result." Singleton, 211 N.J. at 182-83.

As to the applicable aggravating factor, the facts are particularly instructive. The son saw his father watching his mother sleeping on the couch. Once defendant left the son's room, the son heard his mother's body hit the floor and saw defendant standing over the mother while, as the son testified, his mother was screaming in pain. The son then saw defendant choking the mother. About one minute later, went to the kitchen and retrieved a knife, and during this time—knowing defendant was going to kill her—the son heard his mother say, "Let me die in peace." Defendant ignored that plea. Instead, defendant returned to the living room with the knife and in front of the son, began stabbing the mother eighty-nine times on her face, neck, chest, torso, arms, legs, and slit

33

her throat. He did that while the children were in the mobile home. In addition to these substantial wounds, there were several contusions on her body from blunt-force trauma. After the murder, the son observed defendant smoking a cigarette. Defendant then fled the scene, leaving the children to find their mother in the morning. It can reasonably be inferred defendant "intended to cause, and did in fact cause, severe physical or psychological pain or suffering to the victim prior to the victim's death." Bey (II), 112 N.J. at 173 (quoting Ramseur, 106 N.J. at 211).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION