SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. French G. Lee (A-6-25) (090662)**

**Argued March 2, 2026 -- Decided June 29, 2026**

**CHIEF JUSTICE RABNER, writing for a unanimous Court.**

In this appeal, the Court considers whether the trial court erred in not holding a hearing on the admissibility of fingerprint evidence prior to defendant French G. Lee's trial for two burglaries.

A Moorestown restaurant was burglarized twice in September 2018. Security footage from both days showed an intruder in a two-tone hooded sweatshirt remove or attempt to remove cash from underneath the register. A total of five latent prints were lifted from the register following the incidents. All five prints were compared with the Automated Fingerprint Identification System (AFIS), a database of fingerprints used across the country. According to the State, "[t]he AFIS algorithm confirmed that there was a hit, with [defendant] as the suspected source of" the prints. Testimony at trial detailing the four-part "ACE-V" -- Analysis, Comparison, Evaluation, and Verification -- method of fingerprint identification the police used in this case supported the same conclusion. Only the fingerprint evidence linked defendant to the burglaries.

Prior to the trial, defense counsel moved to bar the State from introducing expert evidence about fingerprint analysis, relying primarily on a 2009 report of the National Academy of Sciences titled Strengthening Forensic Science in the United States: A Path Forward (NAS Report), and a 2016 report of the President's Council of Advisors on Science and Technology titled Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (PCAST Report).

Defense counsel detailed a series of substantive concerns about the reliability of fingerprint evidence, including whether the analysis is repeatable among examiners, the subjective nature of the discipline, the absence of objective measures or a uniform set of guidelines to establish an identification, recently identified error rates, assumptions about whether fingerprints are unique and do not change, confirmation bias, and the lack of empirical testing. The Court includes some of the specific comments by counsel based on the two reports on pages 7 through 9 of its opinion. In response, the State cited the "nearly 100 years of history" of the acceptance of fingerprint evidence and argued that the evidence is admissible under the standard set forth in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

1

The trial court denied defendant's motion, and defendant was convicted of both counts of burglary. The Appellate Division reversed defendant's convictions, concluding that the failure to conduct a pretrial hearing to evaluate the reliability of fingerprint evidence under N.J.R.E. 702 was reversible error. The Appellate Division also concluded it was an abuse of discretion not to ask prospective jurors about their views on fingerprint evidence during the voir dire process and that it was error to allow detectives to offer subjective interpretations about what they saw on the surveillance videos, namely whether the suspect in both videos wore the same clothing and was, in fact, the same person. The Court granted certification. 261 N.J. 610 (2025).

**HELD:** Trial courts have a gatekeeping role to ensure that expert testimony is sufficiently reliable before it can be presented to a jury. For that reason, the Court agrees with the Appellate Division that the trial court should have conducted a hearing to assess the reliability of the disputed evidence. The Court appoints a Special Adjudicator to conduct such a hearing. The Court expresses no view on the outcome of the hearing at this time and awaits the results of the hearing to address more fully the other two errors the Appellate Division found.

1. For proposed expert evidence to be admissible under N.J.R.E. 702, the proponent must establish three things: (1) the subject matter of the testimony must be beyond the ken of the average juror; (2) the field of inquiry must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the testimony. The focus in this appeal is on the standard's second prong. The State, as the proponent here, has the burden to establish sufficient reliability. Until 2023, the Court relied on the Frye standard to assess reliability in criminal cases. That standard focused on general acceptance within the field of the proposed expert testimony. The current inquiry to assess reliability in criminal cases was established in State v. Olenowski (Olenowski I), 253 N.J. 133, 151-52 (2023), which invites courts to consider a non-exclusive list of factors known as the "Daubert factors," derived from Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993). Olenowski I declined to disturb rulings based on the Frye standard but noted that when "the scientific reliability underlying the evidence has changed," evidence that had previously been approved should be evaluated under the revised standard. 253 N.J. at 154. (pp. 16-19)

2. Trial judges must assess whether expert testimony is sufficiently reliable before it can be presented to a jury. That gatekeeping function prevents the jury from being exposed to unsound science through the compelling voice of an expert. When a party challenges an expert opinion pursuant to N.J.R.E. 702, the trial court should conduct a hearing under N.J.R.E. 104 concerning the admissibility of the proposed testimony. Whether to conduct a hearing is within the discretion of the trial court. (pp. 19-21)

3. Here, defendant directly challenged the proposed expert testimony, as summarized above and detailed in the Court's opinion. The Court makes no findings on the issues

raised but observes that defendant's challenge raised legitimate issues that warrant further evaluation. As a result, the trial court needed to ensure that the proposed expert testimony was sufficiently reliable before allowing the jury to hear it. The court instead relied on historical practice for more than a century as well as "numerous" federal court rulings that "found expert testimony . . . based on the ACE-V method to be sufficiently reliable." But the parties have not cited published decisions from a New Jersey court that examined the issue in depth. Nor do any reported New Jersey cases review an evidentiary hearing on the reliability of the evidence. It is also unclear the extent to which out-of-state cases have probed concerns about reliability. As the gatekeeper, the court was obliged to assess the reliability of the challenged fingerprint evidence before finding it was admissible. At the same time, it is far from ideal to ask a judge to bar scientific or specialized evidence, which has been admitted for decades, yet not be prepared to present witnesses in support of that position. To avoid what happened here, the better practice for appointed and private defense counsel would be to coordinate in advance with the Public Defender's forensic science unit, and for county prosecutors' offices to coordinate with the Attorney General. (pp. 7-9; 21-24)

4. Because the findings and developments outlined in the NAS and PCAST Reports raise questions about the reliability of fingerprint evidence, the appropriate course is to review the competing claims, based on a thorough record, with the aid of expert testimony. To resolve the critical issue in this appeal, the Court directs that a hearing be held to assess the reliability of the proffered fingerprint evidence. A Special Adjudicator will be appointed to conduct the plenary hearing. In the end, the Special Adjudicator should determine (1) whether the fingerprint evidence presented at trial satisfies the requirements of Olenowski I; and (2) if it does, whether any limitations or guardrails should apply to the admission of fingerprint evidence; and (3) if so, what those limitations or guardrails should be. In that regard, the Court asks the Special Adjudicator to consider the need for revised model jury charges on fingerprint evidence. The Court offers no view on the outcome of the hearing. (pp. 24-25)

5. The Court declines to reverse defendant's conviction at this time. The Court also explains that it will not address either the voir dire or the narration evidence issues reached by the Appellate Division at this time. Only the fingerprint evidence linked defendant to the burglaries. Without it, there was no basis to convict him. If, after the hearing, the Court concludes the evidence is unreliable, the conviction cannot stand. If the Court determines the evidence is admissible, it will then address any remaining, relevant issues properly before it. (pp. 26-31)

**The Court appoints a Special Adjudicator to conduct a hearing in this matter and retains jurisdiction.**

**JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in CHIEF JUSTICE RABNER's opinion.**

3

SUPREME COURT OF NEW JERSEY
A-6 September Term 2025
090662

State of New Jersey,

Plaintiff-Appellant,

v.

French G. Lee,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| March 2, 2026 | June 29, 2026 |

Benjamin M. Shultz, Assistant Attorney General, argued the cause for appellant (Jennifer Davenport, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, Michael L. Zuckerman, Deputy Solicitor General, Benjamin M. Shultz, and Christopher J. Ioannou and Thomas M. Caroccia, Deputy Attorneys General, of counsel and on the briefs).

Tamar Y. Lerer, Deputy Public Defender, argued the cause for respondent (Jennifer N. Sellitti, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Alexander Shalom argued the cause for amici curiae Dr. Adele Quigley-McBride, Dr. Jeff Kukucka, Dr. Jason Chin, and Dr. Brian Bornstein, Experts in Decision Making and Judgment in Legal Contexts (Lowenstein

Sandler, and American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom, Jeanne LoCicero, and Ezra D. Rosenberg, on the brief).

Brian A. Herman submitted a brief on behalf of amicus curiae The Innocence Project, Inc. (Morgan, Lewis & Bockius, attorneys; Brian A. Herman, John J. Pease, III, of the Pennsylvania bar, admitted pro hac vice, Bradie R. Williams of the Pennsylvania bar, admitted pro hac vice, Steven Strauss of the Pennsylvania bar, admitted pro hac vice, and Bryan P. Goff of the New York bar, admitted pro hac vice, of counsel and on the brief, and M. Chris Fabricant (Innocence Project, Inc.) of the New York bar, admitted pro hac vice, on the brief).

Rubin M. Sinins submitted a brief on behalf of amici curiae The Wilson Center for Science and Justice, Professor Simon Cole, Professor Brandon L. Garrett, and Kate Judson, Esq. (Javerbaum Wurgaft Hicks Kahn Wikstrom and Sinins, attorneys; Rubin M. Sinins and Brian N. Biglin, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

This appeal raises questions about the reliability of fingerprint evidence. In the underlying case, a restaurant was burglarized on two occasions, and five latent fingerprints were left behind during the burglaries. A fingerprint examiner concluded the prints matched defendant's, and a jury found him guilty of both burglaries. Only the fingerprint evidence directly linked defendant to the crimes.

Fingerprint evidence has been admitted in court proceedings in New Jersey for more than a century. Two relatively recent, authoritative studies examine and raise questions about the evidence's reliability: a 2009 report of the National Academy of Sciences titled Strengthening Forensic Science in the United States: A Path Forward (NAS Report), and a 2016 report of the President's Council of Advisors on Science and Technology titled Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (PCAST Report).

Relying heavily on those studies, defendant argued that the trial court should not allow expert testimony about fingerprint evidence to be presented to the jury. The State opposed the motion. After hearing arguments from counsel, the trial court admitted the evidence without conducting a hearing to assess the parties' competing claims.

The Appellate Division reversed defendant's conviction on the basis of three errors. The appellate court first found it was error for the trial court not to conduct a pretrial hearing to assess the reliability of the fingerprint evidence.

Trial courts have a gatekeeping role to ensure that "expert testimony is sufficiently reliable before it can be presented to a jury." State v. J.L.G., 234 N.J. 265, 307-08 (2018). For that reason, we agree that the trial court should

3

have conducted a hearing to assess the reliability of the disputed evidence. We now appoint a Special Adjudicator to conduct such a hearing. The parties are to present relevant testimony and other evidence at the hearing, after which the Special Adjudicator should prepare a report with findings and conclusions.

We express no view on the outcome of the hearing at this time. We also await the results of the hearing to address more fully the other two errors the Appellate Division found.

## I.

We draw the following facts from pretrial proceedings and the trial in this case.

## A.

Defendant French G. Lee was convicted of two burglaries of a restaurant in Moorestown. The first took place on September 28, 2018, at 3:45 a.m. Surveillance footage of the burglary showed an intruder walk to the cash register and take a change bag from underneath it. The bag contained $168 in cash. The intruder wore a distinctive two-tone hooded sweatshirt, and most of his face was covered.

Shortly after the burglary, Michael Babcock, the restaurant's owner, and Detective Jason Burk arrived separately at the scene. Each noticed that a screen had been removed from a kitchen window. They also reviewed the

videotape, and the detective lifted a latent fingerprint from the face of a pizza oven. A latent fingerprint is "a complete or partial . . . impression from an unknown subject." PCAST Report 88 https://obamawhitehouse.archives.gov/ sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final. pdf.

Two days later, at 4:47 a.m. on September 30, an intruder broke into the same restaurant. Video footage showed the individual lift and try to open the cash register. This time, the bag of change was inside a locked safe underneath the register. The intruder wore a two-tone hooded sweatshirt. Both Babcock and Detective Burk responded to the scene again. Burk lifted four latent fingerprints from the bottom of the cash register.

All five prints were sent to the New Jersey State Biometric Unit Lab to be compared with the Automated Fingerprint Identification System (AFIS), a database of fingerprints used across the country. According to the State, "[t]he AFIS algorithm confirmed that there was a hit, with [defendant] as the suspected source of [the] latent prints."

Testimony at trial, which we discuss later in more detail, supported the same conclusion. Lieutenant Michael Wiltsey, an expert in the field of fingerprint collection, preservation, comparison, and identification, examined the relevant prints. To conduct his analysis, he used the ACE-V method,

5

which involves four steps: Analysis, Comparison, Evaluation, and Verification. Lieutenant Wiltsey concluded that the five latent impressions he examined "originat[ed] from the same source as" defendant's prints in the AFIS database.

B.

On January 3, 2019, a grand jury returned an indictment that charged defendant with two counts of third-degree burglary. Prior to trial, defendant moved to bar the State from introducing evidence from any experts about fingerprint analysis.

The trial court heard oral argument on the motion on February 28, 2023. Defense counsel, an assistant deputy public defender, relied primarily on the 2009 NAS Report and the 2016 PCAST Report to outline defendant's position. Counsel offered a detailed summary of the reports in open court and argued that they "question the scientific validity of fingerprint analysis."

The following comments, which are drawn directly from the text of the reports in some instances, are not a complete summary of the NAS or PCAST reports. After each quotation from counsel, we reference the corresponding report(s):

6

- "The outcome of friction ridge analysis is not necessarily repeatable from examiner to examiner." See NAS Report 139, https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf.[1]

- "[E]xperienced examiners do not necessarily agree with even their own past conclusions when the examination is presented in a different context some time later." See ibid.

- "ACE-V is too broad to ensure repeatability and does not guarantee that two analysts following it will obtain the same results." See id. at 142.

- "ACE-V is a subjective discipline. It does not require any objective measures to say . . . whether a fingerprint is actually a source [of] identification . . . ." See id. at 139-40.

- "There [is] no uniform set of guidelines as to the number of minutia" in a fingerprint "needed to do an analysis. Some examiners may say three points of identification are sufficient. Other examiners may say eight are sufficient." See id. at 141.

---

[1] The analysis of fingerprints, palm prints, and sole prints is known as "friction ridge analysis." NAS Report 136.

- "[T]here is no rubric" "[i]n terms of [the] quality" of a fingerprint detail or "the amount of points that need to be similar to make a source identification." That "varies from examiner to examiner." See id. at 138-39.

- As to error rates, one black-box "study showed that [the] error rate was 1 in 306, the other study showed that the error rate was 1 in 18." See PCAST Report 96.[2]

- "[F]ingerprint analysis is based on two primary underlying assumptions that . . . aren't supported by the scientific community. That first assumption is that every person has a unique fingerprint. . . . The second assumption is that . . . fingerprints do not change over time." See id. at 61 n.149.

- There are "issues with confirmation bias" because the ACE-V procedure is "not blind." The second examiner, at the verification stage, knows what conclusion the first examiner reached. See id. at 90.

---

[2] "A black box study measures the accuracy of examiners' conclusions without considering how they reached those conclusions." Lucas Zarwell & Gregory Dutton, Nat'l Inst. of Just., The History and Legacy of the Latent Fingerprint Black Box Study 3 (Dec. 2022), available at https://nij.ojp.gov/topics/articles/history-and-legacy-latent-fingerprint-black-box-study.

- "PCAST noted that a method" like the ACE-V approach "is not foundationally valid unless it has been shown, based on empirical studies, to be . . . repeatable, reproducible, and accurate. And these are three issues that the NAS study indicated [are] problematic amongst the fingerprint community . . . ." See id. at 94; NAS Report 142-43.

- "PCAST noted that ACE-V . . . is based on examiner judgment and experience rather than actual data that could be used to produce objective results." See PCAST Report 89, 101.

- "[A] 2017 addendum to PCAST . . . noted the only way to establish the scientific validity and degree of reliability of a subjective forensic comparison method is to test it empirically" to see "how often examiners get it right." See An Addendum to the PCAST Report on Forensic Science in Criminal Courts, https://obamawhitehouse.archives.gov/sites/default/files/microsites /ostp/PCAST/pcast_forensics_addendum_finalv2.pdf, at 3-4 (Jan. 6, 2017).

Defense counsel submitted that "[b]ecause ACE-V does not offer reproducible and consistent results and has a high false positive rate, . . . it cannot be used as a basis for source identification in a criminal trial." Counsel

therefore asked the trial court to "find that the ACE-V method is unreliable and should not be admitted" at defendant's trial.

The State offered several arguments in response. First, it maintained that none of the reports defendant cited "presented any reason . . . to depart from nearly 100 years of history in the State of New Jersey . . . that has allowed for the presentation of expert testimony as to the analysis of fingerprints." The State noted that "fingerprint evidence [was] hardly novel" and dated back to 1914, citing State v. Cerciello, 86 N.J.L. 309, 313-15 (E. & A. 1914). The assistant prosecutor added that "much of what we heard . . . is likely to form the basis of defense counsel's cross examination" of Lieutenant Wiltsey.

Second, the State argued it had met its burden under Evidence Rule 702, which we discuss later. The State noted, in particular, that the evidence was "sufficiently reliable" under the standard set forth in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). The prosecutor submitted that the Frye standard applied, as opposed to the more recent standard discussed in State v. Olenowski (Olenowski II), 255 N.J. 529 (2023), because there had been no showing that "the scientific reliability of fingerprint analysis" had changed.

The State submitted the evidence was admissible under Frye because "the ACE-V method . . . has been found throughout this country to be

sufficiently reliable and generally accepted in the scientific community." For support, counsel pointed to several recent unpublished state court rulings that are not precedential under Rule 1:36-3. Counsel also relied on four federal Circuit Court opinions that found fingerprint evidence reliable and admissible: United States v. Mitchell, 365 F.3d 215 (3d Cir. 2004); United States v. Herrera, 704 F.3d 480 (7th Cir. 2013); United States v. Straker, 800 F.3d 570 (D.C. Cir. 2015); and United States v. Pena, 586 F.3d 105 (1st Cir. 2009).[3]

The trial court denied defendant's motion. It found that fingerprint analysis "is specialized knowledge" under Rule 702 "and will assist a trier [of] fact in making its decisions." The court also observed that,

> [w]ith respect to the ACE-V methodology, . . . evidence relating to fingerprint analysis has been accepted by the New Jersey Courts for over 100 years. Although there's no reported New Jersey cases having specifically addressed the reliability of the ACE-V methodology, numerous federal courts have found expert testimony on fingerprint identification based on the ACE-V method to be sufficiently reliable.
>
> . . . [T]he defendant has not pointed to any cases holding that the ACE-V method is unreliable.

---

[3] Although the following point was not presented at oral argument, we note for completeness that the PCAST Report found "that latent fingerprint analysis is a foundationally valid subjective methodology -- albeit with a false positive rate that is substantial and is likely to be higher than expected by many jurors based on longstanding claims about the infallibility of fingerprint analysis." PCAST Report 9.

11

The trial court then confirmed that defendant did not intend to present any witnesses "to attest to the credibility of the PCAST Report." The assistant prosecutor added that the parties had discussed the matter and agreed "there was no requirement for a full [Rule] 104 hearing or any testimony from anyone."

In response, the trial court held it would "admit the evidence of the ACE-V method," which "ha[d] been found to be sufficiently reliable. There's no case . . . that has been provided pointing to the Court that it has been unreliable." As the trial court further explained, "the ACE-V methodology has been utilized and upheld as reliable by courts throughout this state."

C.

Lieutenant Wiltsey testified at trial. After he explained the steps of the ACE-V method in general, he testified that he found 34 matching points of identification between a print from September 30 and the exemplar of defendant's right middle finger; 18 matching points between a September 30 print and defendant's left ring finger; 19 matching points between a September 30 print and defendant's left middle finger; 20 matching points between a September 30 print and defendant's right middle finger; and 26 matching points between a September 28 print and defendant's right thumb.

For now, we briefly mention two additional issues defendant raised on appeal: (1) the trial court's decision not to ask prospective jurors during voir dire whether they believed fingerprint analysis was reliable; and (2) lay-opinion testimony about the contents of the surveillance videos. Detective Burk and Babcock both testified about what they saw on the surveillance videos of the two burglaries. Detective Burk testified that the sweatshirt depicted in both videos "appear[ed] to be the exact same clothing." Babcock testified that it "looked like the same individual" robbed the restaurant both times.

The jury found defendant guilty of both counts of burglary. The trial court found defendant was eligible for a discretionary extended term and sentenced him to six years' imprisonment in the aggregate, with a two-year period of parole ineligibility.

## D.

The Appellate Division reversed defendant's convictions. It concluded that the failure to conduct a pretrial hearing to evaluate the reliability of fingerprint evidence under Rule 702 was reversible error. The appellate court explained it was error to focus on the historical acceptance of fingerprint evidence rather than consider the reports defendant had proffered and assess whether the expert's opinion was based on a reliably sound methodology.

13

The Appellate Division also concluded it was an abuse of discretion not to ask prospective jurors about their views on fingerprint evidence during the voir dire process. In addition, the court found it was error to allow Babcock and Detective Burk to offer subjective interpretations about what they saw on the surveillance videos. Under State v. Watson, 254 N.J. 558, 603-04 (2023), the appellate court explained, it was for the jury to draw conclusions as to whether the suspect in both videos wore the same clothing and was, in fact, the same person. The Appellate Division found that the cumulative effect of the errors deprived defendant of a fair trial and required that his convictions be vacated.

E.

We granted the State's petition for certification. 261 N.J. 610 (2025). We also granted leave to appear as friends of the court to an expanded group of Experts in Decision Making and Judgment in Legal Contexts (EDMJ) and to the Wilson Center for Science and Justice. The Innocence Project, along with a single representative of the EDMJ, appeared as amici before the Appellate Division and continued to do so here. R. 1:13-9(d)(1).

II.

The State, represented by the Attorney General, submits that courts in New Jersey and across the country have admitted fingerprint analysis because

14

it is reliable and probative. The State contends that, notwithstanding defendant's reliance on the NAS and PCAST reports, he failed to establish a material change in scientific understanding about the reliability of fingerprint evidence. As a result, the State maintains, defendant has not justified the need for a new hearing on the reliability of the evidence.

The State also argues that the trial court properly exercised its discretion not to ask jurors about the reliability of fingerprint evidence during voir dire. In addition, the State contends that the testimony Babcock and Detective Burk presented about the content of the videos did not constitute plain error.

Defendant argues that the trial court's admission of expert fingerprint analysis without analyzing its reliability violated case law as well as his right to a fair trial. Defendant maintains there is "no robust precedent confirming the reliability of fingerprint evidence." Nor has there been a published decision that followed a hearing in New Jersey on the evidence's reliability, according to defendant. Defendant points to findings in the NAS and PCAST reports, among other materials, to cast doubt on the evidence and justify a Rule 104 hearing. He also asks for the appointment of a special adjudicator to conduct a hearing. In addition, defendant maintains that the failure to ask prospective jurors about possible biases related to fingerprint evidence, as well

15

as inappropriate lay-opinion testimony about the contents of the videos, deprived him of a fair trial.

The arguments of amici align with defendant's position. The Wilson Center notes that "[a] great deal has changed" since cases relied on "historic acceptance" to admit fingerprint evidence. The Center points to accuracy studies, statistical models, studies conducted by government and scientific institutions, and errors that have been made public. It encourages the Court to provide for hearings to examine the reliability of fingerprint evidence. The Innocence Project contends that a special adjudicator would be well-positioned to conduct such a hearing, centered on recent research, and to provide guidance on the admission of latent fingerprint testimony. The EDMJ similarly addresses concerns about current procedures and subjective aspects of fingerprint examination. The group also identifies common misconceptions about forensic evidence that jurors, like other members of the public, hold.

III.

A.

New Jersey Rule of Evidence 702 governs the admissibility of expert testimony. The Rule provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge,

16

skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

To satisfy the Rule,

> the proponent of expert evidence must establish three things: (1) the subject matter of the testimony must be "beyond the ken of the average juror"; (2) the field of inquiry "must be at a state of the art such that an expert's testimony could be <u>sufficiently reliable</u>"; and (3) "the witness must have sufficient expertise to offer the" testimony.
>
> [<u>State v. Olenowski</u> (<u>Olenowski I</u>), 253 N.J. 133, 143 (2023) (quoting <u>J.L.G.</u>, 234 N.J. at 280).]

Our focus in this appeal is on the standard's second prong. The State, as the proponent here, has the burden to establish sufficient reliability. <u>See</u> <u>State v. Nieves</u>, 262 N.J. 161, 219-20 (2025); <u>State v. Cassidy</u>, 235 N.J. 482, 492 (2018).

Until 2023, the Court relied on the <u>Frye</u> standard to assess reliability in criminal cases. <u>See</u> <u>Frye</u>, 293 F. at 1014. The test "require[d] trial judges to determine whether the science underlying . . . proposed expert testimony [had] 'gained general acceptance in the particular field in which it belong[ed].'" <u>Olenowski I</u>, 253 N.J. at 144 (omission in original) (quoting <u>J.L.G.</u>, 234 N.J. at 280).

In 2018, the Court continued on a path that did not strictly focus on the <u>Frye</u> test in civil cases. <u>See</u> <u>In re Accutane Litig.</u>, 234 N.J. 340, 349-50, 380-

17

81, 387-90, 396-99 (2018) (summarizing the progression of relevant case law). To assess reliability going forward, the Court in Accutane clarified that the proper focus belonged on the methodology and reasoning underlying proposed expert testimony, not general acceptance. Id. at 397-98.

Five years later, the Court adopted a similar approach for criminal cases. Olenowski I, 253 N.J. at 151-52. As a result, judges now examine "the soundness of the methodology used to validate a scientific theory or technique, the strength of the reasoning underlying it, and the accuracy of the theory or technique in practice." Id. at 150, 154.

To assess reliability, the current inquiry in civil and criminal cases invites courts to consider a non-exclusive list of factors known as the "Daubert factors." Accutane, 234 N.J. at 397-99; Olenowski I, 253 N.J. at 151-52; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993) (listing four factors -- testing, peer review and publication, rate of error, and general acceptance in the relevant scientific community). The Court, however, has not "embrace[d] the full body of Daubert case law as applied by state and federal courts." Accutane, 234 N.J. at 399; Olenowski I, 253 N.J. at 154.

The current standard applies to testimony based on scientific knowledge as well as technical or other specialized knowledge. Olenowski I, 253 N.J. at 154.

Olenowski I acknowledged the existence of prior rulings based on the

Frye standard and declined to disturb them. Ibid. At the same time, the Court

noted that when "the scientific reliability underlying the evidence has

changed," evidence that had previously been approved should be evaluated

under the revised standard. Ibid. The Court underscored that point in

Olenowski II when it observed that

> the reliability of a certain kind of expert methodology
> should not be frozen in time. If new scientific research
> emerges that calls into question the wisdom of such
> precedent, then prosecutors and criminal defense
> lawyers should be free to present that new research to
> the trial courts, with appropriate testimony, and
> advocate for a change in the law.
>
> [255 N.J. at 582-83.]

B.

Trial courts "act as gatekeepers" to ensure "the reliability of expert

testimony." Nieves, 262 N.J. at 220. To fulfill that role, trial judges "must

assess whether expert testimony is sufficiently reliable before it can be

presented to a jury." J.L.G., 234 N.J. at 308; accord Olenowski I, 253 N.J. at

148. In doing so, they "ensure that unreliable, misleading evidence is not

admitted." State v. Chen, 208 N.J. 307, 318 (2011); State v. Williams, 240

N.J. 225, 234 (2019) (same). Indeed, the gatekeeping function prevents the

jury from being exposed "to unsound science through the compelling voice of

19

an expert." Accutane, 234 N.J. at 389. For that reason, the trial judge's "gatekeeping role must be rigorous." Id. at 390; see Beavan v. Allergan U.S.A., Inc., 264 N.J. 99, 107 (2026).

The same principle applies to the federal counterpart to New Jersey's rule. Federal Rule of Evidence 702 likewise imposes a "basic gatekeeping obligation" -- "a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (omission in original) (quoting Daubert, 509 U.S. at 589).

When "a party challenges an expert opinion pursuant to N.J.R.E. 702, the 'trial court should conduct a hearing under [N.J.R.E. 104] concerning the admissibility of the proposed expert testimony.'" State v. J.R., 227 N.J. 393, 409 (2017) (alteration in original) (quoting State v. Torres, 183 N.J. 554, 567 (2005)); see also Chen, 208 N.J. at 319 (noting that "trial judges routinely conduct preliminary hearings under" Rule 104 to carry out their "gatekeeping function" and "guarantee that only relevant, probative, and competent evidence" is admitted). Whether to conduct a Rule 104 hearing is within the discretion of the trial court. State v. Cain, 224 N.J. 410, 430 (2016); Kemp ex rel. Wright v. State, 174 N.J. 412, 428 (2002).

20

Here, defendant directly challenged the proposed expert testimony.  He detailed a series of substantive concerns about the reliability of fingerprint evidence, including whether the analysis is repeatable among examiners, the subjective nature of the discipline, the absence of objective measures or a uniform set of guidelines to establish an identification, recently identified error rates, assumptions about whether fingerprints are unique and do not change, confirmation bias, and the lack of empirical testing.  For support, defendant relied on recent reports from two reputable bodies, the National Academy of Sciences and the President's Council of Advisors on Science and Technology.

We make no findings on any of those issues.  We simply observe that defendant's challenge raised legitimate issues that warrant further evaluation.  As a result, the trial court needed to ensure that the proposed expert testimony was sufficiently reliable before allowing the jury to hear it.  Accutane, 234 N.J. at 389; J.L.G., 234 N.J. at 308.

The court instead relied on historical practice for more than a century as well as "numerous" federal court rulings that "found expert testimony . . . based on the ACE-V method to be sufficiently reliable."  The trial court presumably referred to the four federal Circuit Court rulings the State cited -- Mitchell, 365 F.3d at 246; Herrera, 704 F.3d at 483-87; Straker, 800 F.3d at

631-32; and <u>Pena</u>, 586 F.3d at 110-11.  Like the trial court, we do not consider the unpublished rulings the State referred to.  <u>See</u> <u>R.</u> 1:36-3.

Mitchell and <u>Herrera</u>, to be sure, contain extensive discussions about fingerprint evidence.  But all four cases were decided before the PCAST Report, and two preceded the NAS Report.  As a result, the rulings could not anticipate, for example, error rates in black-box studies highlighted in the PCAST Report.  Defendant also presses other concerns identified in both reports, as noted above.

Before the Appellate Division and this Court, the Attorney General cited multiple cases from other jurisdictions that have addressed fingerprint evidence.  The parties have not cited published decisions from a court in this state that examined the issue in depth.  Nor do any reported New Jersey cases review an evidentiary hearing on the reliability of the evidence.

It is also unclear the extent to which out-of-state cases have probed concerns about reliability.  <u>See</u> Brandon L. Garrett, <u>Judging Fingerprint Evidence</u> 20 (Duke L. Sch. Pub. L. & Legal Theory Series No. 2025-08), https://ssrn.com/abstract=5076620 (observing that in opinions about fingerprint evidence since 1993, when <u>Daubert</u> was decided, "[m]any judges did not carefully examine whether fingerprint evidence was admissible,

22

because they took judicial notice of its admissibility, or relied on prior precedent").

In more recent years, Professor Garrett notes, "courts have discussed the findings of the NAS and PCAST reports, regarding admissibility, and whether hearings should have been conducted," in varying levels of detail. Id. at 22-23. And some courts have conducted "more robust recent hearings." Id. at 23.

We conclude that the trial court in this case should have held a pretrial hearing on the admissibility of fingerprint evidence. The parties' agreement not to ask for a hearing could not and did not resolve the disputed issue. Nor did it amount to invited error. Under that doctrine, errors that "were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). Here, instead, both sides stated their position, identified support for it, and pressed for a ruling on the merits. As the gatekeeper, the court was obligated to assess the reliability of the challenged fingerprint evidence before finding it was admissible. The court should have scheduled a hearing and directed the parties to present their proofs.

At the same time, we recognize the difficult situation the parties placed the trial judge in. Regardless of who has the ultimate burden of proof, it is far

from ideal to ask a judge to bar scientific or specialized evidence, which has been admitted for decades, yet not be prepared to present witnesses in support of that position. To avoid what happened here, the better practice for appointed and private defense counsel would be to coordinate in advance with the Public Defender's forensic science unit, and for county prosecutors' offices to coordinate with the Attorney General.

Before the Appellate Division, defendant asked that his conviction be reversed or, in the alternative, that the matter "be remanded for an evidentiary hearing." He asks this Court to appoint a Special Adjudicator to preside over a hearing. We agree. Because the findings and developments outlined in the NAS and PCAST reports raise questions about the reliability of fingerprint evidence, the appropriate course is to review the competing claims, based on a thorough record, with the aid of expert testimony. See Olenowski I, 253 N.J. at 154.

To resolve the critical issue in this appeal, we direct that a hearing be held to assess the reliability of the proffered fingerprint evidence. The Court has done so in the past under various circumstances. See, e.g., J.L.G., 234 N.J. at 272 (relating to the reliability of evidence about the child sexual abuse accommodation syndrome); State v. Henderson, 208 N.J. 208, 305 (2011) (relating to the reliability of eyewitness identification evidence); State v.

24

<u>Moore</u>, 180 N.J. 459, 460-61 (2004) (relating to the admissibility of hypnotically refreshed testimony). A Special Adjudicator will be appointed to conduct the plenary hearing.

At the hearing, the parties may present testimony and other proofs, including expert testimony, in support of their positions. <u>See</u> <u>Henderson</u>, 208 N.J. at 306. Amici who are already in this case may participate in the hearing. Should other amicus groups seek leave to participate, the Special Adjudicator will have discretion to allow them to do so.

In the end, the Special Adjudicator should determine (1) whether the fingerprint evidence presented at trial satisfies the requirements of <u>Olenowski I</u>; and (2) if it does, whether any limitations or guardrails should apply to the admission of fingerprint evidence; and (3) if so, what those limitations or guardrails should be. <u>See</u> Garrett, at 7, 41. In that regard, we ask the Special Adjudicator to consider the need for revised model jury charges on fingerprint evidence. We respectfully ask the Special Adjudicator to submit a written report of findings and conclusions to the Court and the parties.

In remanding for a hearing, we offer no view on its outcome. Nothing in this opinion should be understood to suggest otherwise.

IV.

We briefly address two remaining points, starting with defendant's challenge to the voir dire process. Defendant asked the trial court to pose this question to prospective jurors: "Do you believe that fingerprint analyses are reliable, why or why not?" The State objected because of a concern that responses might indoctrinate other jurors on the panel. The court asked whether a more open-ended question about expert testimony generally would suffice. Defendant disagreed; he believed such an approach would not reach jurors who held a preconceived notion that fingerprint evidence was infallible.

Ultimately, the trial court did not rule on the matter, and jurors were not asked about their views on the reliability of fingerprint evidence. The Appellate Division found it was error not to ask potential jurors "an open-ended question on their knowledge and views on fingerprint analysis."

Defendants in criminal cases have a constitutional right to be tried before an impartial jury. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. Questioning prospective jurors during the voir dire process is meant to root out biased individuals who cannot decide a case fairly and impartially because of views they hold. State v. Martini, 131 N.J. 176, 210 (1993); State v. Erazo, 126 N.J. 112, 129 (1991).

26

"[V]oir dire should be probing, extensive, fair and balanced." State v. Papasavvas, 163 N.J. 565, 585 (2000). Questions posed should be "neutral" and "non-partisan," State v. Little, 246 N.J. 402, 420 (2021), and courts may "reject or reformulate" a question proposed by counsel "if it crosses the line from inquiry to advocacy" or attempts to "indoctrinate" potential jurors, id. at 417.

Those principles naturally extend to questions about expert testimony. In State v. Murray, for example, the Appellate Division found it was appropriate for the trial court to have asked questions that "probed whether the prospective jurors had read or studied about psychology [or] psychiatry" and whether the jurors' views on those subjects "would hinder [their] ability to follow the law as instructed by the court." 240 N.J. Super. 378, 392 (App. Div. 1990). This Court approved the use of similar questions in State v. Winder, 200 N.J. 231, 253 (2009). Moreover, in Murray, because of the questions the trial court posed, it was unnecessary to ask twelve additional questions defendant proposed about "psychological views." 240 N.J. Super. at 391-92.

In deciding what questions to ask, trial judges are given "reasonable latitude." Winder, 200 N.J. at 252. A judge's exercise of discretion is generally "not to be disturbed on appeal, except to correct an error that

27

undermines the selection of an impartial jury." Ibid.; accord Little, 246 N.J. at 413; Papasavvas, 163 N.J. at 595.

The Appellate Division here found that the trial court's refusal to ask about jurors' views on fingerprint evidence was one of several errors that cumulatively denied defendant a fair trial. The appellate court's conclusion was therefore intertwined with the trial court's failure to conduct a Rule 104 hearing.

We need not address the voir dire issue in isolation at this time because the fingerprint evidence is the more critical, threshold question. We therefore await the outcome of the hearing to evaluate defendant's challenge to the voir dire process.

V.

Last, we touch briefly on testimony by Detective Burk and the owner of the restaurant, Babcock, about the surveillance videos of the burglaries. The detective testified that the sweatshirt worn by the intruder in both videos "appear[ed] to be the exact same clothing." According to the detective, both suspects "appear[] to be wearing the same dark-colored sleeve, light-colored chest and hood sweatshirt." Babcock added that "it looked like the same individual that was there two days prior decided to come back." The

28

witnesses' subjective conclusions went beyond the proper scope of narration testimony.

In <u>Watson</u>, the Court discussed "the limited nature of narration testimony" in an effort to ensure that kind of "testimony does not improperly intrude on the jury's domain." 254 N.J. at 603. The ruling explained that "investigator[s] whose knowledge is based only on viewing [a] recording" may not offer "running commentary." <u>Ibid.</u> <u>Watson</u> also cautioned that "investigators can describe what appears on a recording but may not offer opinions about the content. In other words, they can present objective, factual comments, but not subjective interpretations." <u>Ibid.</u>

And <u>Watson</u> instructed that "investigators may not offer their views on factual issues that are reasonably disputed." <u>Ibid.</u> By way of example, the Court noted that if the parties reasonably disputed whether "that's the same blue car" or "that's the defendant," an investigator could not testify to either point. <u>Id.</u> at 604. <u>Watson</u>, though, does not invite officers to present subjective views and comments about subjects that are not in dispute. As a general rule, investigators and witnesses may offer factual comments about what is depicted in a video; but it is for the jury to draw conclusions from those facts.

29

Applying those standards, it was entirely appropriate for both witnesses to draw attention to the distinctive sweatshirt worn in each video.  See ibid.  Likewise, counsel was free to highlight that evidence in closing argument and to ask jurors to compare the clothing.  The same is true for a black object on the intruder's right hip.  But the witnesses should not have drawn the ultimate conclusion for the jury -- that the clothing in both videos was "of a similar design" or was exactly the same, and the intruder in both burglaries was the same person.

Defendant did not object to the testimony at trial; he first challenged it before the Appellate Division.  The appellate court found that the testimony was improper and comprised an aspect of the errors that cumulatively required a new trial.  To be clear, the Appellate Division found the trial court's failure to conduct a Rule 104 hearing constituted reversible error on its own, and that the "cumulative effect" of all three errors deprived defendant of a fair trial.

As a result, we need not address the significance of the narration evidence in isolation either.  Nor do we consider whether it may have amounted to plain error at this time.  We await the outcome of the evidentiary hearing before addressing those questions.

## VI.

Under the circumstances, we decline to reverse defendant's conviction. Only the fingerprint evidence linked defendant to the burglaries. Without it, there was no basis to convict him. For the reasons set forth above, we now ask a Special Adjudicator to conduct a thorough hearing, make findings, and provide a report on the reliability and admissibility of fingerprint evidence admitted in this case. If we conclude the evidence is unreliable, the conviction cannot stand. If we determine the evidence is admissible, we will then address any remaining, relevant issues that are properly before the Court.

We retain jurisdiction of this matter.


JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in CHIEF JUSTICE RABNER's opinion.

SUPREME COURT OF NEW JERSEY
A-6 September Term 2025
090662

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

        v.                              O R D E R

FRENCH G. LEE,

    Defendant-Respondent.

As set forth in today's opinion, the trial court denied defendant French G. Lee's motion to prevent the State from introducing fingerprint evidence at his trial. Under the circumstances, we held that the trial court should have conducted a hearing to assess the reliability of the disputed evidence.

We therefore ORDER as follows:

1. The matter is summarily remanded for a Special Adjudicator to conduct a plenary hearing, develop a record, and make findings and conclusions regarding the reliability of the fingerprint evidence presented at trial. The Court appoints the Hon. Carmen Messano, retired Chief Judge of the Appellate Division, to serve as the Special Adjudicator.

2. The Special Adjudicator shall provide to the Court a written update on the remand proceeding every ninety (90) days until the remand

1

proceedings have concluded.

3.  The State and defendant may file briefs and present testimony and other proofs, including expert testimony, in support of their respective positions, subject to rulings by the Special Adjudicator.

4.  Amici may also participate in developing the record at the hearing. The Special Adjudicator will have discretion to allow additional amicus groups to participate.

5.  The State shall make arrangements to ensure that the Special Adjudicator receives transcripts of the remand proceedings conducted pursuant to this Order.

6.  After the hearing is completed, the Special Adjudicator shall issue a written report that contains findings and conclusions about the reliability and admissibility of the fingerprint evidence admitted at trial, consistent with the guidance at page 25 of the Court's opinion.

7.  Upon the filing of the Special Adjudicator's written report, all parties and amici shall then have thirty (30) days to file briefs and appendices with this Court, and ten (10) days thereafter to file any responding briefs.  No further submissions will be permitted unless requested by the Court.

8. When the briefing is complete, the Court will determine whether additional oral argument is required. The Court retains jurisdiction.

STUART RABNER
Chief Justice

June 29, 2026

JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in the Court's Order.